# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| METHODS RESEARCH, INC.<br><br>    Plaintiff,<br><br>vs.<br><br>OTTAWA BANCSHARES, INC., FIRST BANK KANSAS, FIRST KANSAS BANK, LYON COUNTY STATE BANK, and COMMERCIAL BANK,<br><br>    Defendants. | Case No. 23-2136-JAR-BGS |

## MEMORANDUM & ORDER DENYING
## RENEWED MOTION FOR SANCTIONS

NOW BEFORE THE COURT is Plaintiff's "Renewed Motion for Sanctions Or, in the Alternative, Motion to Reopen Discovery." (Doc. 117.) Therein, Plaintiff argues Defendants should be punished for allegedly "improperly withholding documents within their possession, custody, and control – specifically, invoices essential to calculating [Plaintiff's] variable fee – and repeatedly misrepresenting that all such documents had already been produced." (*Id.*, at 1.)

A previous incarnation of this issue was the subject of the undersigned Magistrate Judge's prior Order (Doc. 96), in which the Court denied Plaintiff's original request for sanctions. Plaintiff subsequently moved the District Court to review that Order (Doc. 98), which was then denied by the District Court (Doc. 113).

In the present motion, Plaintiff seeks to renew its request for extreme sanctions against Defendants. Plaintiff also argues that "[a]t this late stage of litigation, the prejudice to Plaintiff is incurable without reopening discovery, redoing expert analysis, and re-deposing fact and expert

witnesses." (Doc. 117, at 6.) For the reasons set forth herein, Plaintiff's "Renewed Motion for Sanctions or, in the Alternative, Motion to Reopen Discovery" (Doc. 117) is **DENIED**.

## FACTUAL BACKGROUND[1]

**A.    General Background.**

This is a breach of contract case. In September 2015, Plaintiff presented a proposal to implement an IT Consolidation Project for the four Defendant Banks that would require Defendants to pay a "Fixed Fee" of $1,000,000, as well as a "Variable Fee" equal to 50% of any revenue enhancements, process improvements, and expense reductions recommended by Plaintiff and implemented by the Defendants (Doc. 1, at ¶ 22.) The Fixed Fee was paid by Defendants, but no Variable Fee was paid.

According to Plaintiff, "Defendants internally calculated [the] variable fee and represented [Plaintiff] was owed $0, despite internal Bank documents showing the [Defendants] realized an increase in revenues and a decrease in expenses directly attributable to implementing [Plaintiff's] recommendations." (Doc. 65, at 2 (citing Doc. 1, at ¶¶ 24-25; 34-35).) Plaintiff contends that Defendants overstated their expenses and understated their savings in an effort to avoid owing any Variable Fee. Both sides have prepared calculations of the Variable Fee owed, which vary substantially. Plaintiff filed this lawsuit to recover the Variable Fee it alleges Defendants owe.

**B.    Variable Fee Determination.**

According to Plaintiff, the present motion was necessitated by Defendants' "prolonged failure to produce critical source documents – specifically invoices – despite repeated requests and court-mandated obligations." (*Id.*) Plaintiff contends that Defendants "withheld these essential documents for years." (*Id.*) Plaintiff continues that Defendants provided certain responsive invoices only after

---

[1] The Court notes that much of the factual background that is relevant to the present motion was included in the Court's prior Order. (*See* Doc. 96, at 2-10.) For the sake of clarity, however, the Court is included this factual background herein rather than simply incorporating it by reference.

Plaintiff's experts "had fully formed their opinions, provided written reports, and one had been deposed." (*Id.*) Thereafter, "Defendants produced over 2,500 pages" of responsive documents "that had been in [Defendants'] possession all along, dating back to 2014." (*Id.*, at 1.)

In support of their calculation of the $0 Variable Fee, Defendants submitted an excel document to Plaintiff that summarized their calculations. It apparently was "created by combining figures from hundreds of different underlying excel charts and documents, specifically including invoices from various vendors." (*Id.*, at 3.) The process of calculating Defendants' savings from converting to a new data processing vendor ("Jack Henry" or "JHA"), as recommended by Plaintiff, necessitated "comparing the invoices and the various components of the invoices." (*Id.* (citing Doc. 65-1, at 62:5-63:4).)

Angie Eilrich was the employee responsible for calculating the Variable Fee on behalf of Defendants. She testified that reaching the "data processing monthly savings" figure reported by Defendants required a comparison of monthly invoices from Defendants' prior data processing vendor (DCI) to the monthly invoices submitted by new vendor JHA. (Doc. 65-2, at 63:23-64:6; Doc. 65-3, at 141:25-142:5.) When asked whether it was necessary to review the underlying invoices to verify if Defendants' various summary charts are reliable, Ms. Eilrich testified:

> I believe them to be accurate based on the information that I requested from our people at the time. If you want to prove that, we would have to actually go back. I mean, I can't right now in this moment prove that to you without the documentation.

(Doc. 65-2, at 125:23-126:6.)

Plaintiff contends that it initially requested the invoices in 2018, when it was also trying to calculate the Variable Fee Defendants owed. According to Plaintiff, "Defendants repeatedly refused to provide [the invoices], and instead specifically instructed their employees to not provide [Plaintiff] with the invoices it was requesting." (Doc. 65, at 4 (citations to record omitted).) When asked why

Defendants refused to provide Plaintiff with the requested invoices, Ms. Eilrich testified doing so was "an exhaustive process" and she "didn't see any need to provide it."  (Doc. 65-4, at 181:19-25.)

**C.     Prior Relevant Discovery.**

### 1.     Invoices requested at outset of litigation.

Included in Defendants' Rule 26 initial disclosures, which were served on June 26, 2023, was the requisite listing of documents they may use to support their defenses.  Therein, Defendants listed "sources of expenses, such as invoices and bills from companies recommended by Plaintiffs [sic], including JHA invoices and previous DCI invoices …." (Doc. 65-9, at 4.)  Plaintiff's subsequent first Requests for Production of Documents included Request No. 34, which sought "[i]nvoices from DCI, JHA, and any other Data processing third parties to Defendants for the years 2014 through 2021." (Doc. 65-10 at 12.)  Defendants responded on September 6, 2023, without objection, stating that they "previously Bates numbered and produced the requested documents to Plaintiff."  (*Id.*)

Request No. 37 asked for invoices supporting Defendants' Variable Fee calculation and invoices from various vendors from 2014-2021.  (*Id.*, at 13.)  Defendants raised vagueness and ambiguity objections to Request No. 37 for its use of the terms "including detailed General Ledger information … ."  (*Id.*)  Defendants then responded that they "previously Bates numbered and produced responsive documents to Plaintiff."  (*Id.*)

### 2.     Second formal request for invoices and resulting Court involvement.

On April 5, 2024, Plaintiff submitted its second Requests for Production, to which Defendants responded on May 6, 2024.  (Doc. 65-11.)  Therein, Request No. 9 sought "[a]ll DCI invoices supporting Defendants' assertion that it incurred $1,295,661 in DCI conversion expenses."  (*Id.*, at 8.)  Defendants responded that they had produced the requested documents.  (*Id.*)

The parties subsequently engaged in the "meet and confer" process regarding the invoices supporting the Defendants' Variable Fee calculation, which included a July 2, 2024, conference, and e-

mail on July 9, 2024.  (Doc. 65-12.)  In the July 9 email to defense counsel, Plaintiff's counsel

specifically asked for invoices and "the rest of the underlying documents that support the Banks'

calculations."  (Doc. 65-12, at 2.)  Plaintiff then sent a "golden rule" letter to defense counsel on July

10, 2024, in which Plaintiff requested supplementation of several discovery responses, specifically

including the invoices supporting Defendants' calculation of Variable Fees.  (Doc. 65-13, at 5-6.)

The Revised Scheduling Order included a deadline of August 12, 2024, for Plaintiff's expert

disclosures.  (Doc. 32, at 2.)  Plaintiff sought and received an extension of this deadline to September

23, 2024, which Plaintiff contends was necessary "to provide Defendants time to supplement their

discovery responses and produce the documents identified in Plaintiff's meet-and-confer

communications."  (Doc. 65, at 6 (citing Doc. 65-14).)

Plaintiff contacted chambers for the undersigned Magistrate Judge on August 22, 2024, to

request a pre-motion discovery conference with the Court regarding Defendants' responses to

Plaintiff's Requests for Production; this resulted in a joint status report from the parties on August 27,

2024.  (Docs. 65-19, -20.)  The status report discussed, in part, that Defendants had not provided

invoices as requested in the First Requests for Production No. 34 and Second Requests for Production

No. 9 and that Defendants had not complied with F.R.C.P. 34(b)(E)(i) by organizing and labeling the

documents to correspond to the categories in the request.  (Doc. 65-20.)  The parties were instructed

to confer further; however, they were unable to reach an agreement.  (Doc. 65-21, at 2.)

On August 23, 2024, Defendants produced an additional 384 pages of documents, "noting that

a supplemental response to the discovery request was forthcoming and that several other Banks were

continuing their search."  (Doc. 77, at 4 (citing Doc. 77-7).)  Defendants made additional supplemental

document productions on September 3 and 4, 2024.  (Docs. 65-22 and 65-23.)  Plaintiff contends, and

Defendants do not dispute, that the August 23rd production, as well as the one on September 3, 2024,

included invoices the Defendants had not previously produced.  (Doc. 65, at 6.)  Defense counsel

emailed Plaintiff's counsel on September 4, 2024, stating that Defendant First Kansas Bank "does not have documents to produce related to DCI other than the few card related invoices they found from December 2016 to May 2017, which we produced on August 6 as part of the July 10 response." (Doc. 65-24, at 4.)

The parties' telephone conference with the undersigned Magistrate Judge ultimately occurred on September 9, 2025. (Doc. 51, text Minute Entry.) During that telephone conference, defense counsel was instructed by the Court to provide written supplemental discovery responses by the end of that week, in which they would indicate which previously produced documents were responsive to which of Plaintiff's discovery requests. Defendants submitted their supplemental responses on September 11, 2024, but did not supplement Request No. 34. (Doc. 65-25, at 15.) They did, however, supplement Request No. 9 to provide Bates numbers for certain invoices that were produced on August 24 and September 3, 2024. (*Id.*, at 23-24.)

### 3. Invoices discussed during depositions.

The next day, September 12, 2024, Plaintiff's counsel deposed Defendants' corporate representative, Ms. Eilrich, asking her questions about various internal emails in which Defendants instructed their employees not to provide invoices and other source documents to Plaintiff. (*See* Docs. 65-5, -6, -7, -8.) Plaintiff asserts that Eilrich "confirmed Defendants understood they need to provide all invoices and source documents supporting their Variable Fee calculation," citing the following testimony from her:

> Q. You agree it's only fair for [Plaintiff] to be able to review the invoices, the source documents supporting the banks' summary charts; right?
>
> A. I mean, I – I agree that – that we've been compelled to produce them, yes. At the time we felt like our worksheets and so forth were sufficient without having to go back to every invoice and every report. So as you know, how many there are.

(Doc. 65, at 7 (citing to Doc. 65-4, at 182:2-9).)[2]

Plaintiff contends that its experts' opinions are, in part, based on Defendants' refusal to produce the underlying source invoices. (*Id.*, at 8.) Plaintiff produced its expert reports on September 23, 2024. Both of Plaintiff's retained experts rendered opinions relating to and criticizing the lack of source documents (the relevant invoices) Defendants provided to Plaintiff in support of Defendants' $0 Variable Fee calculations. (*See* Doc. 65-26, report of Daniel Welsh, at 3; Doc. 65-27, report of Mark Palmer, at 3.)

Palmer was deposed by Defendants on October 29, 2024, wherein he criticized Defendants' failure to produce the requested invoices and noted the resulting inability to verify Defendants' calculations. (Doc. 65-28, at 51:17-52:1, 62:20-63:8, 63:23-64:15, and 168:10-169:3.) Palmer testified that if Defendants had provided the requested invoices to Plaintiff, "we wouldn't be here today." (*Id.* at 101:17-102:4.)

Defendants, on the other hand, note that as of the date of that deposition, they had produced 12,739 documents "including more than 1,771 invoices from various third-parties." (Doc. 77, at 1.) Defendants continue by pointing out that both Palmer and Welsh testified they that had not been tasked by Plaintiff with independently reviewing available third-party invoices. (Doc. 77, at 10 (citing Doc. 77-10, Palmer Depo., at 67:4-8, 111:23-112:5, 117:16-18, 136:15-137:2 and Welsh Depo., Doc. 77-11, at 52:16-18, 53:7-11, 108:21-109:3.) In fact, Palmer testified that of the 12,000+ documents produced by Defendants, he only reviewed "[s]omewhere between 50 and 100 [documents]." (Doc. 77-10, at 11:20-12:7). On the other hand, Palmer testified that he "wouldn't even attempt" doing this "[w]ithout having access to much more information than is presented here." (Doc. 77-10, at 136:15-137:2.)

---

[2] The Court notes that this page of the deposition transcript was not contained in Plaintiff's "Exhibit 3," which is Doc. 65-4. The Court could not find this testimony in any other exhibit to Plaintiff's prior Motion for Sanctions. Defendants do not, however, appear to dispute this testimony.

### 4.    Additional invoice production after Plaintiff's expert deposed.

The day after Palmer's deposition, October 30, 2024, Defendants produced for the first time an additional 152 invoices totaling 2,477 pages.  (Doc. 65-29.)  According to Plaintiff, this "new production" of documents included DCI and JHA invoices from 2014-2021 from three of the Defendants.  Defendants also served their "Amended Supplemental Responses to Plaintiff's First and Second Requests for Production," which included a supplemental response to Request No. 34 enumerating documents Defendants produced on August 23, 2024, September 3, 2024, and the responsive invoices newly produced on October 30, 2024.  (Doc. 65-30, at 15-16 .)  The written response stated that Defendants:

> have conducted an exhaustive search for all JHA and DCI related invoices for 2014 – 2021 as applicable to each bank based on conversion dates.  The banks are now producing supplemental documents to close any gaps that previously existed. If they were found to not be previously bates numbered and they were available, they have been identified and produced as part of this supplemental response.

(*Id.*, at 16.)  Plaintiff contends that Defendants' "'exhaustive search' should have occurred much earlier."  (Doc. 65, at 9.)

Following Defendants' October 30 production, Plaintiff's counsel requested a second deposition of a Rule 30(b)(6) corporate representative from Defendants regarding the newly produced 152 invoices.  (*See* Doc. 77-9, at 2-4, November 11-12, 2024, emails between counsel.)  In response, Defense counsel subsequently proposed that, rather than an additional deposition, Plaintiff should submit a targeted interrogatory addressing the issue.  (*Id.*)  Plaintiff's counsel responded that they wanted to conduct the second 30(b)(6) deposition.  (*Id.*)  Defense counsel indicated the deposition would be considered and asked Plaintiff's counsel to "please go ahead and send us your deposition notice, including the specific topics that you intend to address per Rule 30(b)(6), with a tentative placeholder date for the deposition sufficiently in the future to allow us to evaluate the notice, confer

with you regarding any objections to scope, and lock down a mutually agreeable date (assuming we can find mutual ground to proceed without Court intervention." (*Id.*) The Court notes that these November 2024 email communications occurred a month before the rebuttal expert deadline. According to Defendants, Plaintiff did not submit a proposed 30(b)(6) deposition notice and/or engage in further discussion on these issues before filing the first Motion for Sanctions. (Doc. 77, at 5-6.)

On November 11, 2024, however, Plaintiff served Requests for Admissions on Defendants regarding missing invoices, asking Defendants to admit they failed to produce certain invoices. (*See generally* Doc. 77-5.) Defendants complain that these requests were served "seemingly without [Plaintiff] realizing Defendants had produced the specific invoices at issue (often years prior)." (Doc. 77, at 6.) In reality, Defendants identified additional invoices that had not yet been produced. (*Id.*; *see also* Doc. 81-1.) These 50 invoices, constituting approximately 1,600 pages, were subsequently produced on November 25, 2024 (one invoice), and December 9, 2024 (49 invoices). (*Id.*, at 6, 8.)

Plaintiff filed its prior Motion for Sanctions on November 26, 2024. (Doc. 65, discussed *infra*.) Plaintiff's rebuttal expert deadline expired on December 13, 2024, which the Court notes was after the parties engaged in discussions regarding whether Plaintiff would be allowed to take the proposed, additional Rule 30(b)(6) deposition by agreement. Discovery closed on December 31, 2024.

**D.      Plaintiff's Initial Motion for Sanctions (Doc. 65).**

In its prior motion for sanctions, Plaintiff argued that it was severely prejudiced by Defendants' alleged discovery abuses, "as these documents were essential to verifying Defendants' $0 Variable Fee calculation, which is central to this dispute." (Doc. 65, at 2.) Plaintiff requested significant sanctions against Defendants, including the entry of default judgment because of "willful failure to comply with discovery obligations," striking Defendants' affirmative defenses and other pleadings, prohibiting Defendants from "presenting any evidence or argument related to the withheld invoices or any

calculations based on those invoices at trial," and awarding Plaintiff attorney's fees and costs "incurred due to Defendants' misconduct."  (*Id.*, at 1-2.)

Defendants argued that they "worked extensively to locate all third-party invoices and supplemented their production each time additional invoices were found," but complained that "[t]hroughout discovery, [Plaintiff] made repeated requests for the same material that Defendants had already provided … ."  (Doc. 77, at 1-3.)  The Court found this argument to be somewhat dubious considering thousands of pages of responsive documents were not produced by Defendants until the day after the deposition of Plaintiff's expert and again in December 2024 – months after Defendants received the underlying discovery requests from Plaintiff.

The undersigned Magistrate Judge acknowledged the prejudice to Plaintiff but declined to levy the sanctions Plaintiff requested, finding the extreme remedies sought by Plaintiff were unwarranted and that the situation could, most likely, have been cured during the discovery period.  (Doc. 96, at 19-20.)   That stated, the Court was concerned by Defendants' actions.  (*Id.*, at 23.)  In an effort to address any prejudice suffered by Plaintiff, the Court ordered that discovery be re-opened for the limited purpose of Defendants producing a witness for a 3-hour Rule 30(b)(6) deposition regarding the additional invoices, to occur on or before March 14, 2025.  (*Id.*)  The parties were instructed that "[q]uestioning may only relate to supplemental statements or opinions contained in the relevant expert report" and that "[n]**o additional discovery will be permitted**."  (*Id.* (emphasis in original).)

**E.     Objection to District Court.**

Thereafter, Plaintiff filed its "Motion to Review Magistrate's Order Regarding Motion for Sanctions," arguing the Order was "clearly erroneous and contrary to law" because:

> 1. It acknowledges that Defendants failed to timely produce critical invoices and misrepresented their completeness, yet imposes no meaningful sanction;

2. It applies an incorrect legal standard in evaluating Rule 26(g), requiring "direct evidence" of intentional misrepresentation, which is not the standard to award sanctions;

3. It fails to consider or apply the Ehrenhaus factors, an omission that constitutes an abuse of discretion; and

4. It erroneously finds that reopening discovery to provide for a limited corporate representative deposition cures the prejudice suffered by Plaintiff, despite the fact that Plaintiff's experts cannot rely on newly obtained evidence at this stage.

(Doc. 98, at 1.)  As mentioned above, the District Court denied that motion, finding that the decision by the undersigned to not impose sanctions under Rules 26(g), 37(c)(1), or 37(d) was not contrary to law.  (*See generally* Doc. 113.)

**F.      Subsequent 30(b)(6) Deposition of Angie Eilrich**

As allowed by the Court's prior Order, Plaintiff deposed Angie Eilrich on March 13, 2025, as a Rule 30(b)(6) representative of Defendants.  (*See* Doc. 100.)  The deposition notice requested a "corporate representative(s)" prepared to testify as to:

1. The invoices Defendants have produced after October 29, 2024.

2. The timeframe Defendants first located the invoices produced after October 29, 2024.

3. Why such invoices were not produced earlier.

4. Where such invoices were located and the manner in which they were collected.

5. The identity of Defendants' employees or agents who located the invoices produced after October 29, 2024.

6. The identity of Defendants' employees or agents who had access to the invoices Defendants produced after October 29, 2024.

7. How the Defendant Banks relied on the invoices Defendants produced after October 29, 2024 in calculating the variable fee owed to Plaintiff.

(*Id.*; *see also* Doc. 117-1.)

Plaintiff asserts that Eilrich "failed to prepare to testify on behalf of all four Defendant banks," did not speak to anyone from the other three Defendant banks at which she does not work, and failed to review any documents in preparation for the deposition." (*Id.* at 7:21-23.) According to Plaintiff, as a result, Eilrich "was unable to answer questions regarding the invoices located by banks she does not work at, including where they located the invoices, whether the invoices were located in paper or electronic format, or the identity of the employees who had access to the invoices." (Doc. 117, at 3 (citing Doc. 117-1, at 11:12-22, 13:15-14:5, 14:18-21, 42:25-43:3, 44:21-45:10, 57:10-58:11, 61:8-9, 62:6-12.)

Defendants contend, however, that Plaintiff's characterization of Ms. Eilrich as unprepared for the deposition is "simply untrue." (Doc. 121, at 6.) According to Defendants, Plaintiff's inquiries "eventually veered into particularized areas that were not specifically identified in the deposition notice, sometimes to the point Ms. Eilrich would admit she was not sure of certain things." (*Id.*) Defendants continue that Plaintiff

> picked on three areas where Ms. Eilrich *originally* lacked information: (1) describing where within a specific defendant bank invoices were located; (2) the reason any specific defendant bank previously failed to find a late-produced invoice; and (3) whether a representative from a specific bank had confirmed to Ms. Eilrich they were not aware of any further available invoices. However, during breaks in the deposition, Ms. Eilrich received supplemental information from representatives of relevant banks to secure answers to these specific questions, which Ms. Eilrich then provided to [Plaintiff] on the record before the deposition ended.

(*Id.* (emphasis in original) (citing Doc. 121-1, at 63:20-66:20, 80:2-83:16).)

Despite Plaintiff's complaints of deficiencies with Eilrich serving as a corporate representative for all four Defendants, Plaintiff's motion does not request any relief as to the 30(b)(6) deposition itself. As discussed herein, Plaintiff merely "renews and incorporates its prior request for sanctions due to Defendants' discovery misconduct, and in the alternative asks that discovery be reopened to allow for the production and use of all necessary invoices." (Doc. 117, at 7.) Accordingly, the Court

will only analyze whether information learned at the March 13, 2025, deposition warrants the imposition of sanctions or the re-opening of discovery.

Apparently relevant to Plaintiff's request to reopen discovery "to allow for the production and use of all necessary invoices," Plaintiff contends that Eilrich testified

> she discovered unproduced invoices from her bank in September 2024, prompting some – but not all – Defendants to search for additional responsive invoices. Specifically, they were asked to look for invoices from Jack Henry, DCI, Mastercard, Visa, and any third-party processors. Commercial Bank was the only Defendant that was not asked to look for additional invoices to produce and to date, no one has attempted to determine whether it has additional records that are responsive to Plaintiff's discovery requests. Ms. Eilrich did not know whether Commercial has additional responsive invoices to produce.

(Doc. 117, at 3 (citing Doc. 117-1, at 12:9-21, 14:22-15:3, 51:3-11, 60:7-16).)

Defendant responded, however, that Eilrich explained in her deposition that Commercial Bank was not contacted because "there was no reason … to believe responsive invoices were missing from Commercial Bank's prior production." (Doc. 121, n.2 (citing Doc. 121-1, 16:12-18:6).) Eilrich testified that "Commercial Bank did not have any documents that we were able to identify as not Bates numbered" that were responsive and unproduced. (*Id.*) Defendants have confirmed that Commercial Bank "is not currently aware of any additional responsive, yet unproduced, third-party invoices." (*Id.*)

Plaintiff continued that Eilrich was unable to explain why certain invoices were not produced until the day after Plaintiff's first expert was deposed in October while others were not produced until after all of Plaintiff's experts had been deposed in December. (Doc. 117-1, at 18:7-13, 38:20-39:2.) Rather, she testified that someone from the other Defendant Banks would have to answer that. (*Id.* at 63:20-24; 37:7-24.)

Eilrich also testified that Defendants had produced all the supplemental invoices to their counsel at once in October, but additional invoices, totaling over 1,500 pages, were not produced to Plaintiff until December 9, 2024. (*Id.* at 15:24-16:8; 18:14-16, 82:1-24.) On the record, defense counsel

attributed this delay to a "law firm mistake." (*Id.* at 82:1-24.) Eilrich was aware the invoices were requested in Plaintiff's first document requests from July 2023. (*Id.* at 18:21-25.) She was also aware that Chuck Rogers had "frequently" requested them on behalf of Plaintiff prior to that time – possibly before the litigation commenced. (*Id.* at 42:1-13.)

To calculate the variable fee owed to Plaintiff, which Defendants now claim to be $0, Defendants utilized invoices from data processing vendors DCI and Jack Henry. Eilrich and Rebecca Loy (of Defendant First Bank Kansas), testified they calculated the "data processing monthly savings," by comparing invoices from their prior data processing vendor, DCI, to their new data processing vendor, Jack Henry.[3] (Doc. 117-1, at 27:12-15; Doc. 117-3, at 62:8-14; 62:21-63:4; Doc. 117-4, at 45:7-22; 63:23-64:6. *See also* Doc. 117-2, row 5.) Certain expenses contained in the Jack Henry invoices, such as data-processing monthly savings, were removed by Defendants and then calculated in a different category – "card processing monthly savings." (Doc. 117-1, at 26:15-27:6; Doc. 117-4 at 45:23-46:17. *See also* Doc. 117-2, at row 11.)

During her March 13, 2025, deposition, Ms. Eilrich confirmed that the Jack Henry and DCI invoices were also used by Defendants to calculate conversion expenses totaling more than $3 million. (Doc. 117-1 at 27:16-21; 28:2-6; Doc. 117-2, row 6.) She continued that someone from each of the Defendant Banks needed to directly review the Jack Henry and DCI invoices to calculate the conversion expenses and data processing savings. (Doc. 117-1, at 28:7-13.)

Even though Plaintiff has requested the production of all data processing invoices numerous times in this litigation, Ms. Eilrich testified that she has never contacted DCI or Jack Henry to request the invoices Defendants used in their variable fee calculation. (Doc. 117-1, at 104:17-107:4.) Plaintiff

---

[3] The Court notes that the deposition of Loy occurred in March 2024 (*see* Doc. 117-3) and does not constitute new evidence that would have been acquired since the Court's prior ruling on Plaintiff's request for sanctions. The same is true for a portion of the testimony Plaintiff cites from Ms. Eilrich, as it was given during her first deposition in March 2024. (*See* Doc. 117-4.)

argues that "Defendants could easily obtain invoices from these third-party sources and were required to do so under the federal rules. Despite this obligation, they never did, causing severe prejudice to Plaintiff." (Doc. 117, at 5.) Eilrich admitted she could get this information by making a telephone call. (Doc. 117-1, at 104:17-107:4.)

The situation regarding Visa and Mastercard invoices is similar. Plaintiff requested these invoices from Defendants. Ms. Eilrich testified that Defendant First Bank Kansas previously gathered invoices from Visa's online portal system. (*Id.*, at 34:25-35:12.) Even so, she admitted she had not gone to the Visa portal during this litigation to determine whether additional invoices could be downloaded for production to Plaintiff. (*Id.*, at 73:21-74:3; 76:22-77:1.) That stated, during the deposition, Eilrich testified she would access the Visa portal to look for more invoices. (Doc. 121, at 3 (citing Doc. 121-1, at 83:22-85:6; 104:6-11).) She continued that her prior failure to do so was not an intentional attempt to hide information from Plaintiff, but rather because Defendant no longer had a relationship with Visa, so she was simply looking internally. (*Id.*) Defendants assert that after the deposition, Ms. Eilrich confirmed "there were no additional responsive and unproduced Visa invoices via that Visa portal." (*Id.*) Eilrich also testified that she was not aware of anyone on behalf of any of the Defendants requesting invoices from Mastercard to produce in litigation. (*Id.*, at 104:12-16.)

Plaintiff contends these production issues are continuing and that Defendants, to date, "still have not produced all the invoices they … relied upon to calculate Plaintiff['s] … variable fee." (Doc. 117, at 6.) For instance, Eilrich testified that there are "gaps" in Defendants' production of the invoices on which they relied to calculate Plaintiff's variable fee. (Doc. 117-1, at 78:25-79:5.) Plaintiff contends Defendants' "Invoice Production Tracking Chart" also reveals "large gaps in Defendants' invoice production," while also including invoices that were not produced by Defendants until after "Plaintiff's experts had formed their opinions … ." (Doc. 117, at 6 (citing Docs. 117-5 through 117-8).) Defendants respond, however, that they conducted reasonable searches of all available Jack Henry

invoices in their possession, custody, or control, but that Defendants "do not control or have a legal right to access *Jack Henry's* records." (Doc. 121, at 4.)

Plaintiff contends that the information learned in Ms. Eilrich's March deposition supports the imposition of sanctions or in the alternative warrants "reopening discovery, redoing expert analysis, and re-deposing fact and expert witnesses – an extraordinary and unfair burden that cannot be justified by Defendants' delays." (Doc. 117, at 6.)

## ANALYSIS

### A.    Issues with Defendants' Production of Invoices.

In the present motion, Plaintiff contends the invoices it has "persistently" sought "for years have been in Defendants' possession, custody, and control all along." (Doc. 117, at 7.)  Plaintiff argues that Defendants have been remiss in failing to request the invoices at issue from Defendants' vendors or attempting to "obtain them from their own Visa portal." (*Id.*)  Plaintiff continues that "large swaths of invoices it needs to calculate its variable fee and prepare for trial" remain missing.  Thus, Plaintiff "renews and incorporates its prior request for sanctions due to Defendants' discovery misconduct, and in the alternative asks that discovery be reopened to allow for the production and use of all necessary invoices."[4] (*Id.*)

Defendants argue that Plaintiff cannot "renew" its previously denied motion for sanctions because all the issues previously raised have been resolved by the undersigned Magistrate Judge and the District Court.  (Doc. 121, at 1.)  The Court largely agrees.

It is well-established that "once an issue has been resolved in a judicial proceeding, it ordinarily should not be reexamined by the court." *Harris v. City Cycle Sales, Inc.*, 112 F.4th 1272, 1278 (10th Cir. 2024).  It is considered "sound public policy" that a Court should "prevent[ing] continued re-argument

---

[4] Plaintiffs original motion for sanctions (Doc. 65) requested sanctions pursuant to Fed. R. Civ. P. 26(g)(3), Rule 37(c)(1), Rule 37(d), and Rule 37(e).  The Court incorporates by references its prior discussion of the standards for sanctions under these Rules.  (*See* Doc. 98, at 13-22.)

of issues already decided." *Id.*, at 1278-79 (citing *Gage v. Gen. Motors Corp.*, 796 F.2d 345, 349 (10th Cir. 1986) (further citations omitted). Otherwise, "an adverse [resolution of an issue] would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again." *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016).

Although a significant portion of the factual basis for Plaintiff's present motion springs from Ms. Eilrich's March 13, 2025, testimony, the fact remains that nothing she stated at that deposition constitutes "new" evidence and/or evidence of which Plaintiff could (or should) not have been previously aware. In other words, while Ms. Eilrich's deposition may have provided a more detail as to Defendants' acts or omissions regarding the production of these invoices, she was largely elaborating on facts and circumstances previously known to the parties and the Court.

At most, the Court could potentially infer from the portion of Eilrich's March 2025 deposition testimony discussed in Plaintiff's motion that Plaintiff learned for the first time that Defendants had not contacted the vendors directly to request copies of the subject invoices when responding to Plaintiff's discovery requests. Plaintiff's motion does not, however, specifically indicate or establish that this was the first time Plaintiff was made aware of this. The Court is hesitant to jump to such a conclusion, particularly given the extensive and punitive nature of the sanctions sought by Plaintiff.

Further, even assuming for the sake of argument that Plaintiff discovered for the first time at Eilrich's March 2025 that Defendant did not contact its vendors when producing the invoices Plaintiff requested, the fact remains that general concerns relating to the completeness of Defendants' production of these invoices is **not** a new issue that was discovered for the first time during this deposition. For instance, Plaintiff was aware for that there were gaps in Defendants' collection and production of invoices in October 2024. (*See e.g.* Doc. 65-30, at 15-16.) In fact, Plaintiff's concerns go back much further. Plaintiff admittedly was aware that "Defendants **withheld … essential**

**documents for years despite [Plaintiff's] persistent prelitigation and formal discovery requests**." (Doc. 65, at 2 (emphasis added).) Given Plaintiff's ongoing concerns with gaps in the invoices that were produced, issues relating to what Defendants did or did not to in its attempt to compile and produce all relevant invoices could – and should – have been raised by Plaintiff previously.

The Court was not privy to all of the parties' conversations on these issues. However, even if Plaintiff learned for the first time at Eilrich's March 2025 deposition that Defendants did not contact its vendors for these documents, it is because Plaintiff failed to ask these questions previously – for instance, during Eilrich's initial deposition or depositions of other representatives of Defendants. This is especially true given that Plaintiff had been aware that the invoices at issue were provided to Defendants by third parties.

According to Defendants, Plaintiff's arguments

> are not based on any question [Plaintiff's] counsel asked Ms. Eilrich specific to 202 invoices that were produced late and were supposed to be the focus of [Plaintiff's] limited three-hour follow-up Rule 30(b)(6) deposition. Rather, [Plaintiff's] arguments focus exclusively on more generalized questions of how Defendants went about collecting third-party invoices in the first instance. Nothing prevented Plaintiff from asking Ms. Eilrich these more generalized questions regarding Defendants' process for collecting third-party invoices and whether Defendants requested any third party voluntarily produce certain invoices to Defendant when [Plaintiff]originally deposed Ms. Eilrich as Defendants' corporate representative **on September 12, 2024**.

Thus, Defendants characterize Plaintiff's motion as an untimely motion to compel as it should have been filed within 30 days of when Plaintiff knew, or reasonably should have known, of the dispute.[5]

(*Id.*, at 2-3.)

---

[5] Defendants also argue that Plaintiff made no attempt to comply with D. Kan. Rules 37.1 and 37.2 to discuss alleged production deficiencies prior to filing the present motion, which require a meet & confer between counsel and a telephone conference with the Court prior to filing any discovery motion. (Id., at 2-3.) The Court declines to decide this motion on procedural grounds, particularly given the lengthy history the Court has with addressing these very production issues with the parties.

The Court agrees.  What prompted the Court to allow Plaintiff to take the second 30(b)(6) deposition was Defendants' late production of the last batch of invoices – not the manner in which Defendants' compiled the documents they produced.  The Court's Order allowing the second 30(b)(6) deposition stated that "discovery will be re-opened for the limited purpose of Defendant producing a witness for a Rule 30(b)(6) deposition regarding the additional invoices."  (Doc. 96, at 23.)  The Court finds that Eilrich's March 2025 testimony does not provide a basis for the relief requested by Plaintiff – either in the form of a renewed request for sanctions or as a request to reopen discovery.

**B.**     **Possession, Custody, or Control of the Subject Invoices.**

Plaintiff also argues that sanctions are appropriate because Defendants "improperly" withheld these invoices which, although maintained by Defendants' vendors, were in Defendants' possession, custody, or control.  (Doc. 117, at 1.)  Pursuant to Federal Rule 34(a), a party must produce requested documents within its possession, custody or control.

Plaintiff relies on the case of *Ice Corp. v. Hamilton Sundstrand Corp.* to analyze the concept of possession, custody, or control under Rule 34.  (*See* Doc. 117, at 2 (citing 245 F. R. D. 513 (D. Kan. 2007).)  The *Ice Corp.* court held that

> 'control comprehends not only possession but also the right, authority, or ability to obtain the documents.'  Specifically 'Courts have universally held that documents are deemed to be within the possession, custody or control if the party has actual possession, custody or control or has the *legal right to obtain the documents on demand*.' …
>
> Therefore, Rule 34(a) enables a party seeking discovery to require production of documents beyond the actual possession of the opposing party if such party has retained 'any right or ability to influence the person in whose possession the documents lie.'

245 F. R. D. at 516-17 (emphasis in original) (citing *Super Film of America, Inc., v. UCB Films, Inc.*, 219 F.R.D. 649, 653 (D.Kan.2004) (citation omitted); *McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 692 (D. Kan. 2000); *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 307 (D.Kan.1996); *Heartland Surg.*

*Specialty Hosp., LLC. v. Midwest Div., Inc.*, No. 05–2164, MLB, 2007 WL 950282 at *16, 2007 U.S. Dist. LEXIS 22090 at *61 (D.Kan. March 26, 2007) (citation omitted)).

As discussed above, Plaintiff points to Eilrich's testimony that she could have requested the subject invoice from Defendants' vendors by making a telephone call. (Doc. 117, at 5.) There is nothing in Ms. Eilrich's testimony, however, that indicates Defendants intentionally mislead Plaintiff to believe that Defendants had contacted their vendors when compiling their invoice production.

Additionally, Defendants argue that they "do not control or have a legal right to access" and have "no legal right to demand" to the vendor invoices at issue. (Doc. 121, at 4.) Defendants characterize Plaintiff's position and reliance on the *Ice Corp.* decision as "misguided" because the analysis of the "possession, custody, or control" issue contained therein was labeled as "flawed and not persuasive" in a subsequent ruling from this District. (*Id.* at 4-5 (citing *Noaimi v. Zaid*, 283 F.R.D. 639, 641 (D. Kan. 2012).) *See also Laber v. U.S. Dept. of Defense*, No. 18-1351-JWB-GEB, 2021 WL 4902251, at *13 (D. Kan. Oct. 21, 2021) (internal citation omitted) (noting that the *Ice Corp.* decision "has been explicitly described as 'flawed and not persuasive.'").

Plaintiff replies that the *Noaimi* decision "reaffirmed" the *Ice Corp.* holding that "documents are deemed to be within the possession, custody, or control if the party has the legal right to obtain the documents on demand." (Doc. 125, at 2.) While this is generally true, a reading of *Noaimi* distinguishes the facts relating to the "legal right to obtain the documents" in *Ice Corp.*, wherein the production was ordered "because defendant had a contract with a non-party that allowed defendant to secure certain documents on demand, e.g., defendant had a legal right to the documents." 283 F.R.D. 639, n.7.

As the party seeking production, Plaintiff "bears the burden to prove that Defendant[s have] control, under Fed. R. Civ. P. 34, over" the documents at issue. *Laber*, 2021 WL 4902251, at *13. Simply stated, Plaintiff has failed to do so. Beyond Plaintiff's conclusory assertion, there has been no

showing herein that Defendants have the legal or contractual right to demand the subject documents from their vendors.  The fact that Eilrich could have called and requested the documents does not prove that the vendors would have been legally obligated to have provided them to her on demand.

While Plaintiff spends a significant amount of time arguing that Defendants could have simply requested these invoices from their vendors, nowhere in Plaintiff's motion or reply does Plaintiff provide any justification for its own decision not to subpoena the documents directly from the vendors.  Instead, Plaintiff merely asserts that "[w]hile Plaintiff would need to serve a subpoena on these entities, the Defendants could simply call and request that these vendors send them their prior invoices … ."  (Doc. 117, at 5.)  Plaintiff admittedly struggled for years to obtain the invoices from Defendants, facing what Plaintiff describes as "stonewalling and repeated misrepresentations" by Defendants.  (Doc. 125, at 3.)  According to Plaintiff, this struggle began before this litigation was filed. (Doc. 117, at 4.)

"It is well-established that courts generally will not interfere with a party's chosen manner and method of discovery."  *Anderson v. Heartland Coca-Cola*, No. 21-2530-EFM-KGG, 2022 WL 4465012 (citing *McCloud v. Board of Geary County Comm'rs*, No. 06-1002-MLB, 2008 WL 3502436, at *2 (D. Kan. Aug. 11, 2008) (citing *Audiotext Communications Network, Inc. v. U.S. Telecom, Inc.*, No. 9402395–GTV, 1995 WL 625962, at *5 (D. Kan. Oct. 5, 1995))).  That stated, Plaintiff admits that it could have subpoenaed the documents, but, for whatever reason, simply chose not to.

The Court is at a loss to understand why Plaintiff chose not to subpoena the vendors at some point during the very lengthy discovery period in this litigation – particularly when Plaintiff admittedly had concerns that it was not getting all the requested information from Defendants.  Regardless of Plaintiff's reasoning, the fact remains that these issues have been addressed by the parties and the Court *ad nauseam*.  For instance, the issue of possession, custody, or control was specifically raised by the parties in the context of Plaintiff's original motion for sanctions and addressed in the prior Order

from undersigned.  (*See* Docs. 65, at 9-10, 14; Doc. 77, at 13; Doc. 81, at 4-5; Doc. 96, at 12, 22.)

Plaintiff does not indicate why the arguments presented herein could not have been addressed

previously given that Plaintiff had been aware that the invoices were received by Defendants from their

third-party vendors.  The arguments raised by Plaintiff do not support the entry of an Order allowing

the requested relief.

**C.     Plaintiff's Experts' Potential Reliance on the Invoices.**

Defendants also argue that Plaintiff has failed to issue a supplemental expert report or explain

"'how the experts would have relied on the invoices – if at all.'"  (*Id.*, at 2 (citing Doc. 113, at 9, District

Court Order).)  While Plaintiff says that it was prejudiced by its experts' "inability to incorporate the

invoices into their expert reports or depositions" (*see* Doc. 117, at 1), this is merely a regurgitation of

arguments previously made by Plaintiff.

Defendants continue that Plaintiff's complaints about the invoices are "moot" based on this

prior Order from the District Court.  Therein, Judge Robinson held that "nothing prevents, except

time and cost, Plaintiff's other experts from supplementing their reports with the new invoices

(assuming that the reports even analyze the invoices in the first place)."  (Doc. 113, at 10.)  Plaintiff

even acknowledges this holding by the District Court in the present motion.  (*See* Doc. 117, at 2 (citing

Doc. 113, at 10).)  Defendants argue this language from Judge Robinson "indicates the Court does not

believe [Plaintiff] should be allowed to supplement its expert reports at all unless [it] can demonstrate

its original expert reports made an attempt to analyze and form opinions based on the 1,772 third-party

invoices in [its] possession before those reports were due" – and that Plaintiff cannot do so.  (Doc.

121, at 2.)  The Court agrees.  Defendants also correctly point out that not one of Plaintiff's experts

"has based any substantive opinion on an analysis of any third-party invoices."  (*Id.*)

Plaintiff replies that Charles Rogers, its non-retained expert[6], "previously testified that in order to calculate Defendants' savings to determine MRI's variable fee, he would analyze information from the invoices but that he does not have a complete set of invoices for any of the four banks and does not have the invoices he needs to finalize his calculations of MRI's variable fee." (Doc. 125, at 2 (citing Doc. 88-5 at 11:20-12:3; 35:2-4; 105:2-3; and 105:9-10).)  Plaintiff continues that Rogers "confirmed that each time he received data from additional invoices, he would update his calculations of the variable fee" but that he is "still waiting on a complete set of invoices so that he 'can do a before-and-after comparison of volume changes.'"  (*Id.* (citing Doc. 88-5, at 81:17-21; 83:11-13; 84:23-85:12; 143:14-19).)

This testimony from Rogers, however, is not new evidence.  It was previously submitted to the Court by Plaintiff in opposition to Defendants' Motion to Strike Limited Opinions of Chuck Rogers (Docs. 83, 84).  (*See* Plaintiff's opposition brief, Doc. 88, at 6, 11 (citing and discussing these portions of Rogers' deposition).)  This testimony does not provide the Court with a sufficient basis to provide the excessive sanctions Plaintiff requests.  Further, as discussed above, the new information – in the form of Eilrich's March 2025 deposition testimony – and related arguments advanced by Plaintiff also fail to meet the applicable standards to warrant the imposition of the sanctions requested.  As such, the Court finds no basis to provide Plaintiff with the relief requested.  Plaintiff's motion (Doc. 117) is, therefore, **DENIED**.

### D.      Plaintiff's Alternative Request to Reopen Discovery.

The deadline to engage in discovery, which was contained in the operative Scheduling Order, expired in December 2024.  This original discovery period lasted approximately 18 months.  On February 3, 2025, the Court entered its Order on Plaintiff's prior motion for sanctions, which allowed that discovery "be re-opened for the limited purpose of Defendant producing a witness for a Rule

---

[6] Rogers was the subject of prior Orders from the undersigned and the District Court.  (*See* Docs. 106, 126.)

30(b)(6) deposition regarding the additional invoices," which was to occur on or before March 14, 2025.  (Doc. 96, at 23.)  As discussed herein, this resulted in a second deposition of Angie Eilrich on March 13, 2025.  (Doc. 117-1.)  Plaintiff now argues that, as a result of Eilrich's testimony at this deposition, discovery be reopened to allow for "redoing expert analysis, and re-deposing fact and expert witnesses … ."  (Doc. 117, at 6.)

A scheduling order "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  The good-cause standard requires the moving party to establish that the "existing scheduling order deadlines cannot be met despite the movant's diligent efforts."  *Kone v. Tate*, No. 20-1080-TC-ADM, 2021 WL 1210009, at *3 (March 31, 2021) (in context of motion to take depositions out of time) (citations omitted).  The party seeking to establish good-cause typically must provide sufficient explanation for the delay.  *Testone v. Empire Marketing Strat.*, 942 F.3d 979, 988 (10th Cir. 2019).

"It is well-established that a court has broad discretion in managing the pretrial schedule."  *Cranmer v. Cordell & Cordell, P.C.*, No. 23-1066-TC-BGS, 2024 WL 81199, at *1 (D. Kan. Jan. 8, 2024) (citing *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1254 (10th Cir. 2011)).

> In exercising that discretion on a motion to reopen discovery, the Court will consider six factors:  (1) whether trial is imminent, (2) whether the request is opposed, (3) the prejudice to the non-moving party, (4) whether the moving party diligently attempted to obtain discovery before the deadline passed, (5) the foreseeability of the need for additional discovery, and (6) the likelihood that the discovery will lead to relevant evidence.

*Kone*, 2021 WL 1210009, at *7 (citing *Smith v. United States*, 834 F.2d 166, 169 (10th Cir. 1987)).

Considering the facts and arguments presented by Plaintiff, the Court finds that the standard to reopen discovery has not been met.  This case has been pending since March 2023 and allowed the parties a lengthy discovery period of approximately 18 months.  Discovery has been closed since December 2024.  The Pretrial Conference occurred on March 25, 2025, with the Pretrial Order entered on March 31, 2025 (Doc. 116).  Plaintiff was clearly aware of issues relating to the production of the invoices at issue, even pre-dating the filing of this lawsuit.  Further, as discussed above, Plaintiff had

every opportunity to subpoena the invoices from the third-party vendors and simply chose not to do so. For these reasons, the Court **DENIES** Plaintiff's request to reopen discovery.

## CONCLUSION

For the reasons set forth herein, Plaintiff has not established a justification its renewed request for sanctions and/or its request to reopen discovery, redo expert analysis, and re-depose fact and expert witnesses. Further, Plaintiff has not met its burden to establish that Defendants had the requisite possession, custody, or control of the invoices at issue that were maintained by their vendors.

IT IS THEREFORE ORDERED that Plaintiff's Renewed Motion for Sanctions or, in the Alternative, Motion to Reopen Discovery (Doc. 117) is **DENIED** as more fully set forth above.

IT IS SO ORDERED.

Dated May 29, 2025, at Wichita, Kansas.

/s/ BROOKS G. SEVERSON
Brooks G. Severson
U.S. Magistrate Judge