## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **METHODS RESEARCH, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23-2136-JAR-BGS** |
| **OTTAWA BANCSHARES, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff Methods Research, Inc. ("MRI") sued Defendants Ottawa Bancshares, Inc., First Bank Kansas, First Kansas Bank, Lyon County State Bank, and Commercial Bank ("the Banks") for breach of contract (Count I), negligent misrepresentation (Count IV), and fraud (Count V). Before the Court is the Banks' Motion for Summary Judgment (Doc. 132). The motion is ripe for decision, and the Court is prepared to rule. For the reasons explained below, the motion is granted.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. In applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[1] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[2] "A fact is material if under

---

[1] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[2] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the substantive law it is essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[4]

The moving party must initially show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy this burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be

---

[3] *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 882 (10th Cir. 2015) (quoting *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001)).

[4] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[5] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Celotex*, 477 U.S. at 324.

[8] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see also Kannady*, 590 F.3d at 1169.

identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[11]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[12]

## II.    Uncontroverted Facts

The following material facts are either uncontroverted, stipulated to, or viewed in the light most favorable to MRI.

In February 2014, the Banks contacted MRI regarding MRI potentially providing information technology ("IT") and operational consulting services to the Banks.  On February 1, 2015, the Banks hired MRI as an IT consultant tasked with assessing the consolidation of IT functions across the Banks.  This assessment lasted six weeks and was completed on April 27, 2015.  Following this assessment phase of their relationship, MRI submitted to the Banks a proposal to complete a new phase of their relationship: the implementation phase of the IT consolidation project.  Tom Thompson (President and Chief Executive Officer of Lyon County State Bank), on behalf of the Banks, and Hal Robertson (Co-Owner and President of MRI), on behalf of MRI, signed the proposal to complete the implementation phase of the IT consolidation project (the "Agreement") on September 14, 2015.

---

[10] *Adams*, 233 F.3d at 1246 (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.3d 1022, 1024 (10th Cir. 1992)).

[11] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[12] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

The Agreement detailed this phase in the "PROFESSIONAL ARRANGEMENTS" clause of the Agreement:

> It is anticipated that the Implementation phase of the IT Consolidation project will take approximately 15–18 months. For our services to achieve optimum effectiveness, the scope and focus is customized for each engagement. When determining a fee structure, MRI thoughtfully considers the specific content and scope of each engagement given the preliminary discussions of your needs, MRI's extensive experience and market knowledge, MRI's proven systems and our anticipated value-add to the project.[13]

The Agreement provided for payment from the Banks for MRI's services based on three separate fee provisions: an acceptance fee[14], a fixed fee, and variable fees. The fixed fee is a flat fee of $50,000 per month, beginning one month after commencement, including costs such as travel and expenses. The Banks have paid a total of $1,000,000.00 in fixed fees.

The variable fees are a performance-based fee dependent on future conditions. The variable fees provision of the Agreement stated:

> MRI's variable fee is performance based fee equal to 50% of the annual income improvement of any and all Revenue Enhancements, Process improvements, and Expense Reductions recommended by MRI and implemented by The Banks. The performance based fees are payable for a two year period. The variable fees are payable monthly commencing with the implementation and measurement of each MRI recommendation(s). The total amount of fixed fees paid are exempt from the variable fee. For example, if 15 months of fixed fees are paid during the implementation phase of the project ($750,000), then the variable fee portion would be paid on the total revenue enhancements and/or expense reductions less $750,000.[15]

---

[13] Doc. 1-1 at 6.

[14] The Banks paid MRI a $50,000 one-time acceptance fee on the signing of the Agreement, which is undisputed in this action. *See* Doc. 116 at 3.

[15] Doc. 1-1 at 6.

The parties did not negotiate the fixed fee language in the Agreement, but they did change the variable fees language MRI had originally proposed from 33% of annual income improvement for three years to 50% of annual income improvement for two years.

The Agreement also contained other relevant provisions. The SCOPE provision stated: "[t]he scope of the Implementation phase will include the following major activities for each function to be consolidated:

> Consolidation planning;
> Floor plan design and layout as needed;
> Standardization of workflows, operating practices and procedures
> Job descriptions for each workstation;
> Operating procedures for major activities;
> Staffing levels for consolidated functions and other operational areas;
> Consolidation of selected functions for each bank; [and],
> General revenue enhancements and expense reductions."[16]

The METHODOLOGY provision stated: "[t]he Banks' management and MRI consultants will participate in the planning and implementation of the consolidation.

> Finalize consolidation strategy and project plan;
> Establish milestones to be used for tracking project progress;
> Validate data and information collected in the Assessment phase;
> Develop a list of consolidation/conversion related tasks with assigned responsibilities;
> Identify the managers and supervisors for each activity to be consolidated;
> Develop the physical layout for the consolidated functions;
> Prepare the workspace(s) for consolidated operations;
> Review the operating practices, procedures and workflows for the consolidated functions and other operational areas in detail in order to develop best practice procedures;
> Develop staffing levels and job descriptions for each function to be performed at the consolidated center;
> Review the plan for recruiting the additional staff required for each function consolidated;
> Consolidate functions prior to software conversion when appropriate;

---

[16] *Id.* at 4.

Oversee the consolidation of the remaining functions;
Review post-consolidation/conversion issues and modify practices
and/or procedures as necessary; [and],
Recommend and implement revenue enhancements and expense
reductions."[17]

The "DELIVERABLES" provision stated: "[t]he deliverables of the Implementation

phase of the project are listed below:

> Manage the planning and implementation of the consolidation of
> the following operational areas: data processing, deposit,
> operations/call center, item processing, loan operations, [and]
> accounting;
> Develop best practice workflows, operating processes and
> procedures for the consolidated functions and other operational
> areas;
> Develop staffing recommendations for the consolidated and other
> operational areas;
> Ensure that job descriptions are updated for the functions where
> changes in operating practices or procedures have occurred;
> Develop the physical layout for the consolidated functions;
> Oversee the scheduling and delivery of training programs for new
> systems, practices and procedures;
> Negotiate consolidated core and ancillary system contracts and
> terminate all existing individual contracts as required;
> Manage the data conversions of all four banks to the new standard
> platform;
> Establish the method to be used for allocating costs to the affiliate
> banks; [and],
> Implement and measure revenue enhancements and expense
> reductions approved by [the] Banks."[18]

From September 2015 until April 2017, MRI provided the Banks with hundreds of

recommendations. Sometime after MRI started providing its recommendations, MRI provided

the Banks with worksheets that listed all of MRI's various recommendations so that the Banks

could track which recommendations they implemented or declined; but the Banks did not track

which recommendations were accepted. Nor do the Banks have a document that details which

---

[17] *Id.* at 4.

[18] *Id.* at 5 (citation modified).

recommendations were implemented or declined.  In fact, on January 22, 2017, the President and

Chief Executive Officer of First Bank Kansas, Kent Buer, believed the Banks no longer needed

MRI's services because they had already implemented MRI's recommendations that they

intended to implement.

In May 2017, MRI invoiced the Banks for a $200,000 variable fee based on a $1.4

million signing bonus the Banks received from MasterCard following MRI's negotiating of the

MasterCard contract.  On May 27, 2017, Robertson emailed Angie Eilrich[19] (Executive Vice

President & Chief Operating Officer for Defendant First Bank Kansas) and stated that he would

"start billing each bank our variable fee now that we are no longer billing the monthly fixed fee.

Collectively, the banks were paid a $1,400,000 bonus.  We agree to exclude the total amount of

the fixed fees paid to MRI (which was $1,000,000) before variable fees apply.  Therefore, the

variable fee of 50% apply (sic) to the $400,000 difference."[20]

This invoice in May 2017 was MRI's first communication to the Banks regarding the

variable fees.  At the time of this invoice, Eilrich believed MRI was doing exactly what it said it

would do in the contract if the bonus was considered a revenue enhancement.

On June 14, 2017, Thompson circulated to the other bank presidents a draft email to

Robertson, which stated:

> Sorry for the delay in responding to your request for distribution of
> the MC bonus funds.  As a group we needed to review the request
> and the contract.  We understand the agreement to say that fees are
> based on an amount equal to 50% of annual income improvement
> of any and all Revenue Enhancements.  The MasterCard signing
> bonus was $1,400,000 so 50% of that would be $700,000.  The
> consensus of the group was that we need details on how the
> accounting of the income and expenses will be calculated on

---

[19] Eilrich was the initial employee the Banks charged with solving the variable fees issue.

[20] Doc. 144-5 at 2.

annual basis.  I think a conference call to the group will be helpful
to resolve the questions of each bank.[21]

Eilrich responded proposing a different draft email:

Sorry for the delay in responding to your request for distribution of
the MC bonus funds.  As a group we needed to review the request
and the contract.  Before payment of this distribution or future
requests we believe that clarification is needed regarding the
variable fee calculation method.  We would invite a conference
call to discuss the formula for this item as well as what we should
anticipate in the future.  It is also important that we identify how
expenses relating to enhancements and process improvements will
be factored into the calculations.[22]

That same day, Buer wrote two other emails.  The first was sent to the other bank
presidents and stated, "[i]n my opinion, the Variable Fees portion of the contact [sic] very
nebulous and open for interpretation."[23]  The second was sent to Eilrich and stated, "[t]he contact
[sic] does not say **gross income** improvement.  It has been our assumption all along that we are
measuring the improvement in **net income**.  The fact that the contact [sic] is addressing both
Revenue Enhancements and Expense Reductions also suggests that we [are] working towards
improvement in **net income**."[24]

On June 20, 2017, Buer wrote two emails to Steve Scott[25] discussing the variable fees
provision.  The first email stated, "[t]he contract, in my opinion, [i]t is very nebulous and open to
interpretation.  It discusses income, but does not say if it is gross income or net income.  It does
not address how we are going to handle the conversion expenses."[26]  The second email stated,

---

[21] Doc. 141-14 at 2–3.

[22] *Id.*

[23] Doc. 141-16 at 2.

[24] Doc. 141-17 at 2 (emphasis in original).

[25] The Court is unable to identify Scott's professional title or relationship to the Banks from the undisputed record.

[26] Doc. 144-9 at 2.

"[o]nce we started having [discussions] it was evident that there are several different interpretations as to how the contact should be interpreted."[27]

On June 30, 2017, Buer met with Scott and Eilrich to discuss the variable fees provision. During this meeting, Buer prepared handwritten notes that stated, "Steve will try to get all of the banks on the same page without 'ram rodding.'  He's going to work to try to convince Tom Thompson that we don't need to allocate the full $1.4 million towards MRI's variable fees."[28] Eilrich provided deposition testimony detailing some of her thoughts on whether expenses should be included in any variable fee calculations:

> Q. If the contract doesn't provide for the inclusion of any expenses
> in the calculation of the variable fee, then why include them at all?
> A. Why include them at all?  Because it's the right thing to do . . .[29]

MRI previously provided the Banks two templates on two different occasions for the Banks to use in calculating the variable fee.  The first template was sent around September 20, 2017.  On October 26, 2017, MRI sent a second tracking template, but this template was focused on addressing savings from a recent data processing change the Banks implemented resulting from a recommendation from MRI.  To calculate the savings from this data processing change, the Banks decided to utilize a different measurement methodology than contained in MRI's second tracking template.

In January 2018, approximately 8 months after MRI sent the first variable fee invoice, the Banks first developed their tracking methodology and instructed their employees to disregard tracking requests from MRI and instead utilize the Banks' methodology.  Eilrich described their methodology as "a complex process to come up with a formula that will allow each bank to track

---

[27] Doc. 144-4 at 2.

[28] Doc. 144-10 at 2.

[29] Doc. 141-12 at 72:22–73:2.

individual and unique items while maintaining a master outcome to determine, what, if anything the group of banks owe to MRI."[30]

On January 28, 2019, Ryan Commerford (Chief Financial Officer of First Kansas Bank) emailed Eilrich that his understanding of the variable fees provision is that "we have plenty of room when we compare '50% of total net income' to the 'fixed fees paid to MRI,' before we may have to pay anything to MRI . . . based on our preferred methodology of course. Just as an FYI . . . we didn't budget any MRI 'payback.'"[31] At the time the Banks signed the Agreement, the Banks had not decidedly understood whether the variable fees were to be multiplied by 50% prior to or after subtracting the fixed fee.[32] On July 22, 2019, Scott wrote to Eilrich, "[y]ou guys have done a great job preventing further unnecessary payouts to MRI. I am sure the other banks probably don't fully recognize what a job it has been."[33]

On March 20, 2021, Eilrich emailed Rebecca Rios[34] requesting "help with a couple items on the MRI project;" specifically, Eilrich wrote, "[u]sing information from the call reports, MRI is taking issue with our increase in net income. We need to provide some narrative as to where this increase came from outside of their recommendations since our calculations suggest otherwise. Can you find some big categories such as fee income from ATC or loan income that

---

[30] Doc. 141-25 at 2.

[31] Doc. 141-34 at 2.

[32] The order of operations directly implicates the total variable fees owed, if any. MRI proposes the following calculation reflects the variable fees provision: [Amount Due = (Variable Fees – Fixed Fee) x 50%]. The Banks' proposal calculates the variable fees sum with the 50% multiplier prior to subtracting the fixed fee: [Amount Due = Variable Fees (i.e., 50% x Income Improvement) – Fixed Fee]. Because we know $1,000,000 in fixed fees is undisputed, the financial impact of the parties' disagreement is a known quantity. As long as half the variable fees sum is greater than or equal to the fixed fee (i.e., at least $2,000,000), the delta, regardless of the variable introduced, results in a $500,000 difference between the parties' calculations.

[33] Doc. 141-36 at 2.

[34] Rios is an employee of the Banks, but her title is not found in the undisputed record.

would have been outside the scope of their recommendations?"[35]  The Banks utilized the cash basis method of accounting when working with the variable fees provision of the Agreement, but otherwise generally utilized the accrual method of accounting for their business operations.  The cash basis method of accounting records revenue and expenses when cash related to those transactions is actually received or dispensed; the accrual basis method of accounting records revenue and expenses when transactions occur but before money is received or dispensed.

MRI has 30 years of experience in measuring the savings generated by customers implementing their recommendations.  MRI typically works in conjunction with clients to develop a methodology to measure each item.  Robertson testified:

> Q: "You say you have 30 years of experience and, what, methodology for doing this; is that right?"
> A: "For measuring, knowing on hundreds of different things that we implemented and how we measured each and every one of them."
> Q: "But you have something you can present to your clients to indicate how you would go about doing that?"
> A: "Yes, typically we would."
> Q: "Did you here?"
> A: "We weren't allowed to."
> Q: "What do you mean you weren't allowed to?"
> A: "Once the project was over and we were in the measurement phase, we explained ad nauseam that we typically work with the banks to develop a methodology to measure each item.  We were told our services weren't required for that, that they would measure it all on their own."[36]

Robertson further testified that his disagreement with the Banks on how to calculate the variable fees was not due to distrust in the Banks; specifically, Robertson stated, "I had no reason to believe through this process that there was any manipulation of data or anything of that nature. We continued to question whether we were collecting the right data to measure that component

---

[35] Doc. 141-37 at 2.

[36] Doc. 133-1 at 79:7–25.

and completely measure that component and apples to apples measure the components.  I have no reason to believe that [Eilrich] and her staff were doing anything other than what they thought was best."[37]  To date, the Banks have never paid MRI a variable fee.

## III.    Discussion

The Banks move for summary judgment on the three remaining claims in this matter: (1) breach of contract; (2) negligent misrepresentation; and (3) fraud.  The Court addresses each in turn.  As explained below, the Court grants summary judgment on all three claims.

### A.    Breach of Contract

"[A] federal court sitting in diversity must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules."[38]  Kansas applies the Restatement (First) of Conflict of Laws in addressing choice of law issues.[39]  Kansas courts apply the rule of *lex loci contractus* to breach of contract claims.[40]  Under this rule, the law of the state where the parties made the contract controls.[41]  Further, in Kansas, a contracted choice of law provision controls all questions of law flowing from the parties' contract and any breach thereof.[42]  Here, the Agreement was signed in Kansas and the parties agree that this case is governed by Kansas law. Therefore, the Court applies Kansas substantive law below.

Under Kansas law, a party establishes breach of contract by proving five elements: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the

---

[37] *Id.* at 139:21–140:8.

[38] *Boyd Rosen & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351, 1352–53 (10th Cir. 1997).

[39] *See, e.g.*, *In re K.M.H.*, 169 P.3d 1025, 1031–32 (Kan. 2007).

[40] *Mirville v. Allstate Indem. Co.*, 71 F. Supp. 2d 1103, 1107 (D. Kan. 1999).

[41] *Id.*

[42] *Pepsi–Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (applying Kansas law).

contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[43]

MRI contends the Banks have breached the Agreement in two respects: (1) by failing to allow MRI to exercise its unilateral authority to measure the revenue enhancements, process improvements and expense reductions the Banks realized; and (2) by failing to pay the variable fees consequently owed to MRI.  The Banks contend the variable fees provision is unenforceable because: (1) the parties never had a meeting of the minds that MRI had the unilateral authority to measure the enhancements, improvements and reductions; and (2) the parties never had a meeting of the minds on the methodology to calculate the variable fees, which is a material term of the Agreement.[44]

"'In order for parties to form a binding contract there must be a meeting of the minds on all the essential terms thereof.  To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract.'"[45]  Under Kansas law, an agreement to make a contract in the future is not binding "unless all the essential terms and conditions are agreed upon and nothing essential to complete it is left to future negotiations."[46]  "A material term is a

---

[43] *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citing *Com. Credit Corp. v. Harris*, 510 P.2d 1322, 1325 (Kan. 1973)).

[44] Because the Court concludes that the variable fees provision is unenforceable, the Court does not reach the Banks' alternative argument that MRI's interpretation of various terms within the variable fees provision should be rejected.

[45] *Price v. Grimes*, 677 P.2d 969, 974 (Kan. 1984) (quoting *Steele v. Harrison*, 552 P.2d 957 (Kan. 1976)).

[46] *Underground Vaults & Storage, Inc. v. Cintas Corp.*, No. 11-1067-JWL, 2013 WL 3815867, at *7 (D. Kan. July 22, 2013) (quoting *Phillips & Easton Supply Co. v. Eleanor Int'l, Inc.*, 212 Kan. 730, 734 (Kan. 1973)).

'contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.'"[47] "Only reasonable certainty is required in a purported contract, but where the purported contract is so vague and indefinite that the intentions of the parties cannot be ascertained, it is unenforceable."[48]

      1.     **Measurement of Revenue Enhancements, Process Improvements and Expense Reductions**

MRI claims the Banks breached by not permitting MRI to measure the revenue enhancements, process improvements and expense reductions the Banks realized from recommendations they approved. MRI argues that the Banks had a duty of good faith and fair dealing to allow MRI to perform its duty of measuring the improvements in order to calculate the variable fees.

The Banks contend they never reached a meeting of the minds that MRI had the sole authority to measure "annual income improvements" from revenue enhancements, process improvements and expense reductions they adopted upon MRI's recommendation. However, the Agreement does not expressly state that MRI has the unilateral authority to measure such. The "SCOPE" section of the Agreement merely sets forth a bulleted list of "major activities for each function to be consolidated."[49] "General revenue enhancements and expense reductions" is one bulleted item on the list of major activities; but this section does not mention measurement of such.[50] The METHODOLOGY section of the Agreement states, "[t]he Banks' management and

---

[47] *James Colborn Revocable Tr. v. Hummon Corp.*, 408 P.3d 987, 993 (Kan. Ct. App. 2017) (quoting Black's Law Dictionary 1698–99 (10th ed. 2014)).

[48] *Underground Vaults*, 2013 WL 3815867, at *7 (quoting *Mohr v. State Bank of Stanley*, 770 P.2d 466, 480 (Kan. 1989)).

[49] Doc. 1-1 at 4.

[50] *Id.*

MRI consultants will participate in the planning and implementation of the consolidation."[51] This statement is then followed by a bulleted list that includes: "[v]alidate data and information collected in the Assessment phase," and "[r]ecommend and implement revenue enhancements and expense reductions."[52]  Further, the DELIVERABLES section of the Agreement provides a list of bulleted deliverables including, "[e]stablish the method to be used for allocating costs to the affiliate banks," and "[i]mplement and measure revenue enhancements and expense reductions approved by [t]he Banks."[53]

But none of these sections indicate that MRI had the sole authority to measure annual income improvements through the various revenue enhancements, process improvements or expense reductions adopted by the Banks.  The SCOPE section is likewise silent.  While the DELIVERABLES section lists establishing a method of cost allocation and implementing and measuring improvements, it is not clear that only MRI had the responsibility and authority to do this.  This is particularly so because the METHODOLOGY section indicates that the Banks and MRI would participate and work collaboratively to validate data and information collected in the assessment phase, which is part of the process of measurement of annual income improvements tied to recommendations that the Banks approved and implemented.

However, even if the Court concluded the parties reached a meeting of minds on *who* was to measure the enhancements, improvements and expense reductions, for the reasons addressed below, the Court nonetheless concludes that the Banks did not breach the variable fees provision because it is unenforceable due to indefiniteness.

---

[51] *Id.*

[52] *Id.*

[53] *Id.* at 5.

### 2.    Enforceability of the Variable Fee Provision

While MRI contends the Banks breached the Agreement by failing to pay the variable fees MRI demanded, the Banks argue that the parties never had a meeting of minds on how the variable fees provision was to be calculated and that the variable fees provision is unenforceable for indefiniteness.  The Banks posit, and the Court agrees, that at best the parties agreed to work towards a methodology for determination of the variable fee.  Indeed, one of the deliverables is to "[e]stablish the method to be used for allocating costs to the affiliate banks."[54]  And the parties agree that the variable fees provision does not include a price, methodology, or equation for calculating the value of MRI's services, if any.  MRI argues that such terms are not material, as the parties agreed that MRI would unilaterally determine the variable fees based on its 30 years of experience in making what is a complex calculation based on the individual circumstances of its client, including the specific nature of the recommendations its client approved for implementation.

But the Court finds the variable fees provision of the Agreement is too indefinite to be enforced.  The variable fees provision is contingent on future events, so it is necessarily devoid of an agreed-upon price.  To be sure, such a contract is not inherently unenforceable as indefinite.[55]  But this Agreement *also* does not include a general or specific formula or methodology for calculating the value of any and all revenue enhancements, process improvements, and expense reductions, nor does it include any general standard or limitations that could inform the parties' mutual understanding as to what the calculation even partially entails.  The variable fees provision of the Agreement fails to include any of the following: a

---

[54] *Id.*

[55] *See Price*, 677 P.2d at 974 (finding a loan agreement enforceable where the price at which a property was to be sold was not determined at the time of contracting, as the amount would depend on market fluctuations).

definite price, a predicted price, a capped price, a precise calculation methodology, an example formula for measurement, sample variables and factors possibly included in measurement, or even past sample variable fees amounts from previous agreements.

MRI argues that the premise of the bargain is that MRI would be the one to create the calculation methodology due to their 30 years of experience.[56]  It is uncontroverted that Robertson provided the following testimony:

> Q: "You say you have 30 years of experience and, what, methodology for doing this; is that right?"
> A: "For measuring, knowing on hundreds of different things that we implemented and how we measured each and every one of them."
> Q: "But you have something you can present to your clients to indicate how you would go about doing that?"
> A: "Yes, typically we would."
> Q: "Did you here?"
> A: "We weren't allowed to."
> Q: "What do you mean you weren't allowed to?"
> A: "Once the project was over and we were in the measurement phase, we explained ad nauseam that we typically work with the banks to develop a methodology to measure each item.  We were told our services weren't required for that, that they would measure it all on their own."[57]

At bottom, MRI argues the Agreement purposefully omits even a general description of a pricing calculation methodology, but it is nonetheless enforceable because the Agreement also gives MRI the unilateral authority to determine the methodology that determines its own fee after the contract is signed.  MRI thus argues that the variable fees provision is not an unenforceable "agreement to agree" because the Banks never had the option to agree to MRI's method of calculation in the first instance.

---

[56] Doc. 141 at 30 ("The very premise of the bargain was that MRI, with its 30 years of expertise, would identify opportunities, help implement them, and measure the resulting financial results – taking as its fee a percentage of the benefits.").

[57] Doc. 133-1 at 79:7–25.

While there is no Kansas case directly on point, other courts have addressed very similar situations with contracts that lack a price term or methodology for determining price.  In *ATA Airlines, Inc. v. Fed. Exp. Corp.*, the Seventh Circuit addressed whether to enforce a tripartite contract between airlines.[58]  The contract did not include, among other items, financial terms, but instead simply stated a promise to "share business 50/50 between" the airlines.[59]  The contract also failed to include a price term for compensation that was influenced by many changing circumstances between the parties.[60]  There, Judge Richard Posner found the contract unenforceable due to indefiniteness, emphasizing that a contract is rightfully found indefinite where "it leaves out (1) a crucial term that (2) a court cannot reasonably be asked to supply in the name of interpretation."[61]  Judge Posner explained that indefiniteness includes the "missing [of] vital terms, such as price, that can't be readily supplied by a court, for example by reference **to a price formula agreed on by the parties**."[62]

Judge Posner further noted that the "proper division of responsibility between the contracting parties, on the one hand, and a court asked to enforce a purported contract, on the other, requires the parties to decide on the key terms of the contract (**or at least on a methodology that generates the key terms more or less mechanically**), such as price, and leaves the court to resolve only issues that, being unlikely to arise, the parties should not be required to have foreseen and provided for."[63]  The impact of this responsibility on the doctrine

---

[58] 665 F.3d 882 (7th Cir. 2011).

[59] *Id.* at 888.

[60] *Id.* at 886–88.

[61] *Id.* at 887 (citing *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 655 (7th Cir. 2004)).

[62] *Id.* (citing *Restatement (Second) of Contracts* § 33 (1981); 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.27, at 417–20 (3d ed. 2004)).

[63] *Id.* at 887 (emphasis added).

of indefiniteness "has particular force when the contract is one between sophisticated commercial entities and involves a great deal of money."[64]

That describes the Agreement here, which is between a sophisticated network of banks and a consultant firm with over 30 years of experience. But these parties did not agree on any methodology from which this Court could enforce the variable fees provision. MRI claims that the Banks owe it a variable fee on a $1.4 million bonus the Banks received from Mastercard for a new contract MRI negotiated on their behalf. But the Agreement lacks any definite terms about the methodology of determining the variable fee other than that the fee is assessed on "50% of the annual income improvement of any and all revenue enhancements, process improvements, and expense reductions recommended by MRI and implemented by the Banks."[65] And, the variable fees provision also provides that the "variable fee portion would be paid on the total revenue enhancements and/or expense reductions less . . ." than the amount of fixed fees paid during the implementation phase of the project.[66]

But the Agreement simply does not provide any general calculation principles and is riddled with ambiguities evidencing that the parties did not reach a meeting of the minds as to how variable fees would even generally be calculated. MRI complains that the Banks padded their calculation of annual income improvement with inappropriate expenses and apparently used actual income and expense numbers rather than accrued income and expenses. And the Banks complain that the variable fees should not be calculated on an item-by-item basis, such as on a singular bonus from Mastercard, but should be calculated based on the annual income

---

[64] *Id.* (citing *PFT Roberson, Inc. v. Volvo Trucks North America, Inc.*, 420 F.3d 728, 730 (7th Cir. 2005); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 815 (7th Cir. 1987)).

[65] Doc. 1-1 at 6 (citation modified).

[66] *Id.*

improvement across all of the Banks from implemented recommendations. And MRI insists that the variable fees are calculated based on annual *gross* income improvement, without accounting for expenses incurred in adopting the particular recommendations. The Banks insist that the variable fees are calculated based on annual *net* income improvement, because if the expenses of adopting the recommendation(s) exceed the income improvement, it would be a nonsensical result for MRI to collect a variable fee if the recommendation cost rather than saved the Banks money. The Agreement is silent on these terms as well. Thus, even if the Court found that the variable fees provision was enforceable, the Court could not construct, based on the terms of the Agreement, what the proper calculation of variable fees entails.

In short, the Agreement does not indicate any general calculation principles or methodology, nor can the Court readily turn to an industry norm to supply the same.[67] And even if all the holes that pepper the parties' ambiguousness arguments could be filled by some objective source of guidance that enables judicial completion of an incomplete contract, the calculation methodology, that MRI argues it uniquely possesses, could not be supplied by such source.

MRI cites four cases that it represents support its position that the variable fees provision does not omit material terms. But each case either cuts against MRI's arguments or is readily distinguishable. First, in *Relational Design & Tech., Inc. v. Brock*, the court granted the defendants relief from judgment on a plaintiff's breach of contract claim because there was no evidence from which the jury could find an agreed upon price, a value of services, an original budget, or statements by the defendants that they acknowledged an agreed upon price.[68] In fact,

---

[67] Again, the Court notes this omission is seemingly by design, as MRI's summary judgment briefing consistently suggests that it was in sole possession of the expertise needed to perform this calculation.

[68] No. CIV. A. 91-2452-EEO, 1994 WL 132957, at *6 (D. Kan. Mar. 30, 1994).

the *Brock* Court distinguished itself from MRI's second cited authority, *Storts v. Martin K. Eby Const. Co.*.[69]  The *Storts* Court declined to find an essential price term omitted where the agreement provided a maximum guaranteed cost, and the plaintiff submitted the maximum cost figures based on the plans and specifications as specified in the contract.  The Agreement here provides no such guidance.

Third, in *Phillips & Easton Supply Co. v. Eleanor Int'l, Inc.*, the Kansas Supreme Court upheld a trial court's finding that an agreement to purchase a commercial building was binding where the agreement contemplated the later execution of formal documents to be handled through a bank, such as a sale contract or escrow agreement pending title clearance, a deed of conveyance and the lease-back agreement, because the parties already contracted to the cash sale of the property at a stated price.[70]  Here, the key distinction is that there was no agreed upon price, nor does the Agreement state how the underlying value of the recommendations were to be calculated or how the information (whatever that information may be) that informs that value should be collected and transmitted.

Fourth, in *Wallerius v. Hare*, the Kansas Supreme Court addressed an appeal from a judgment ordering specific performance on an agreement to sell land.[71]  The *Wallerius* Court simply found that post-land sale discussion concerning a request for a deed to a third party was "collateral to the contract and did not amount to a counter proposal."[72]  The Court does not disagree with the general proposition the *Wallerius* Court found; it simply bears no relevance to the facts at hand.  Here, there is no allegation that post-contractual discussion destroyed the

---

[69] *Id.* (distinguishing *Storts v. Martin K. Eby Const. Co.*, 535 P.2d 908, 913 (Kan. 1975)).

[70] 512 P.2d 379, 383–85 (Kan. 1973).

[71] 438 P.2d 65 (Kan. 1968).

[72] *Id.*

Agreement; rather, the issue is that material terms were entirely omitted, which renders the present Agreement unenforceable regardless of post-contractual discussions.

Finally, it is undisputed that the Agreement not only omitted such terms as: an agreed upon price, a value of services, an original budget, statements by the Banks that they acknowledged an agreed upon price, general calculation principles, or a description of the methodology. The Agreement is also silent on how the Banks were to collect, deliver, and maintain the vital financial information MRI argues the Banks failed to provide when requested. Accordingly, the Court is left with an agreement silent on far too much to be remedied by interpretation. The Court will not, under the guise of interpretation, write a new agreement that provides the essential terms of the variable fees provision.[73] The variable fees provision is unenforceable.

### 3.    Variable Fees Provision Severability

The parties only dispute the enforceability of the variable fees provision; and the Court only finds the variable fees provision of the Agreement unenforceable. The Banks have paid MRI over $1,000,000.00 in fixed fees to date and MRI does not allege any additional fixed fees or costs are owed. And while the Agreement does not provide a severability provision, Kansas law encourages severance where lawful and unlawful provisions can be easily severed.[74] Here, the variable fees provision is wholly distinct from the already-paid fixed fees provision that is not in dispute; accordingly, the Court finds the variable fees provision unenforceable and severed from the rest of the Agreement.

---

[73] *See Restatement (Second) of Contracts* § 33 (1981) (noting that "one party may be given power to fix the price within limits set by agreement or custom or good faith"); *see Underground Vaults*, 2013 WL 3815867, at *8 (denying summary judgment due to indefiniteness where the agreement's pricing was based on a **fixed rate** known by both parties at the time of bidding).

[74] *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM, 2023 WL 4026509, at *3 (D. Kan. June 15, 2023).

B.    **Negligent Misrepresentation**[75]

In 1994, the Kansas Supreme Court adopted[76] the tort of negligent misrepresentation as

described in the Restatement (Second) of Torts § 552 (1976).[77]  Under Kansas law, "the elements

of [a] negligent misrepresentation claim are that (1) the person supplying the false information

failed to exercise reasonable care or competence in obtaining or communicating it; (2) the party

receiving the false information reasonably relied on it; (3) the person relying on the false

information was a person for whose benefit and guidance the information was supplied; and (4)

the party receiving the information suffered damages."[78]  The Kansas Supreme Court also

advised that "'the comments to § 552 show that negligent misrepresentation applies to suppliers

of commercial information in favor of users of such information in their commercial

transactions.'  Section 552 does not apply to a misrepresentation of intention to perform an

agreement."[79]  Finally, a tort claim must be independent from a contract claim; a tort claim will

be independent if it is based on a duty that is independent of the contract.[80]

---

[75] The parties do not address which state's substantive law applies to the last two claims; however, the parties' briefing utilizes Kansas law when addressing all of the claims.  Kansas courts apply the doctrine of *lex loci delicti*, where the wrong occurred. *Hawley v. Beech Aircraft Corp.*, 625 F.2d 991, 993 (10th Cir. 1980).  Under this doctrine, Kansas law governs Plaintiff's claims for fraud and negligent misrepresentation. *See Ritchie Enters. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1046 (D. Kan. 1990).  Accordingly, the Court applies Kansas substantive law to Plaintiff's fraud and negligent misrepresentation claims.

[76] *Mahler v. Keenan Real Estate, Inc.*, 876 P.2d 609, 616 (Kan. 1994).

[77] The Restatement states: "(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

[78] *BHC Dev., L.C. v. Bally Gaming, Inc.*, 985 F. Supp. 2d 1276, 1287 (D. Kan. 2013).

[79] *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1171–72 (D. Kan. 2006) (quoting *Gerhardt v. Harris*, 934 P.2d 976, 984 (Kan. 1997)).

[80] *Id.* (citing *Universal Premium Acceptance Corp. v. Oxford Bank & Trust*, 277 F. Supp. 2d 1120, 1129–30 (D. Kan. 2003)).

As an initial matter, MRI argues that the Banks did not expressly move for summary judgment on the negligent misrepresentation claim.[81] But, in the Banks' motion for summary judgment,[82] they explicitly move for summary judgment on the negligent misrepresentation claim, though they do not explicitly refer to the term "negligent misrepresentation" in their memorandum in support of summary judgment.[83] In their reply brief, the Banks clarify that their arguments in support of summary judgment on the negligent misrepresentation claim are encompassed in their arguments regarding MRI's "inability to prove nonspeculative damages," and further, that the unenforceability of the variable fees provision is fatal to the negligent misrepresentation claim.[84]

Here, MRI's claim for negligent misrepresentation concerns the Banks' representations regarding the value of the variable fees allegedly owed and the Banks' representations as to how it calculated that amount. MRI's breach of contract claim, that the Banks breached by not permitting MRI to solely measure the value of their recommendations, is based on the same underlying facts. A party may not bring a tort claim based on the same facts alleged in its contract claim if the contract specifically defines the duties of the parties.[85] However, "[a] party may be liable in tort for breaching an independent duty towards another, even where the relationship creating such a duty originates in the parties' contract."[86]

---

[81] Doc. 141 at 1 n.1.

[82] Doc. 132.

[83] Doc. 133.

[84] Doc. 150 at n.3.

[85] *Graphic Techs., Inc. v. Pitney Bowes Inc.*, 998 F. Supp. 1174, 1179 (D. Kan. 1998) (citing *Ford Motor Credit Co. v. Suburban Ford*, 699 P.2d 992, 999 (Kan. 1985)).

[86] *See Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1202 (10th Cir. 1988).

But the Court need not wade into whether MRI's negligent misrepresentation claim sufficiently distinguishes itself from the breach of contract claim, because no reasonable juror could find MRI relied on any alleged misrepresentation by the Banks.   Nothing in the summary judgment record supports the notion that MRI relied on the Banks' representations about the value and calculations of any variable fees.  Summary judgment is appropriate where there is no evidence of reliance on the alleged negligent misrepresentations.[87]  And, to the extent MRI argues the Banks negligently misrepresented their intent to perform future actions, such a claim is not actionable under the doctrine of negligent misrepresentation.[88]

### C.    Fraud

MRI's fraud claims advance on three fronts: (1) the Banks fraudulently represented to MRI that they would pay a variable fee; (2) the Banks fraudulently concealed their intent not to honor the contract terms regarding the payment of the variable fee; and (3) the Banks provided MRI fraudulent calculations in an attempt to justify their refusal to pay the variable fee.  "In order to prove a claim for fraud relating to future events, a plaintiff must show that the defendant had no intention of performing his promise at the time he made it.  There must be more than mere nonperformance to show fraudulent intent."[89]  Here, much like its claim for negligent misrepresentation, MRI's fraud claim is the same as its breach of contract claim: a dispute over the variable fees provision.  MRI supports its fraud claim by advancing a post-signing timeline of circumstantial evidence to support these three theories.  Yet, all of the evidence MRI cites

---

[87] *Rodriguez v. ECRI Shared Servs.*, 984 F. Supp. 1363, 1366 (D. Kan. 1997) (granting summary judgment on a negligent misrepresentation claim where the plaintiff failed to show it relied on the misrepresentations).

[88] *Zhu v. Countrywide Realty, Co.*, 165 F. Supp. 2d 1181, 1205 (D. Kan. 2001).

[89] *Flight Concepts Ltd. P'ship v. Boeing Co.*, 819 F. Supp. 1535, 1549 (D. Kan. 1993).

centers around the same breach of contract issues of how and by whom the variable fees calculation is constructed.

Having reviewed the summary judgment record, the Court fails to find any evidence that could support MRI's arguments. MRI's arguments overwhelmingly rely on the general proposition that summary judgment is rarely available for a fraud claim, as intent and circumstantial evidence are largely creatures of fact. However, the Court finds the present facts support the rare instance of granting summary judgment regardless of the theory advanced.

First, the Court finds no reasonable juror could find that at the time of signing the Agreement the Banks fraudulently represented to MRI that it would pay a variable fee, because the nature of the variable fees provision left open a reality in which the Banks did not owe MRI any money (which is seemingly the point of including a fixed fees provision).[90] Second, MRI does not point to any evidence independent of its breach of contract claim that the Banks fraudulently concealed their intent not to honor the contract terms regarding the payment of the variable fee. Instead, MRI simply reexamines the conduct underlying its breach of contract claim and infers such non-performance must demonstrate fraudulent intent at the time of signing.[91] Third, MRI's argument that the Banks provided MRI fraudulent calculations to justify their refusal to pay the variable fee does not save its fraud claim for the same reason. In short, all three of MRI's fraud theories rest on conduct occurring after the Agreement was signed and concern the lack of mutual understanding and alleged nonperformance stemming from the now

---

[90] Even assuming MRI succeeded on its breach of contract claim, there was always a possibility the value of MRI's consultant work would not result in an amount owed. MRI admits as much when it argues that it could not measure the impact of its recommendations until after signing. *See* Doc. 141 at 31.

[91] *Sithon Maritime Co. v. Holiday Mansion*, No. 96-2262-KHV, 1999 WL 156167, at *7 (D. Kan. Feb. 16, 1999) ("Where a claim of fraud is predicated on a promise or statement concerning future events, plaintiff must prove more than mere nonperformance to show fraudulent intent.").

unenforceable variable fees provision.  Accordingly, the Court grants summary judgment on MRI's fraud claim, negligent misrepresentation claim, and breach of contract claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 132) is **granted**.

**IT IS SO ORDERED.**

Dated: March 2, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE